# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| HARRIET BELL, individually and on behalf of all similarly situated persons, | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. 1:06-CV-1993-CC |
| vs. | ) ) | |
| CALLAWAY PARTNERS, LLC | ) ) | JURY TRIAL DEMANDED |
| Defendant. | ) ) ) | |

## DECLARATION OF DEBORAH ERICKSON

I, DEBORAH ERICKSON, hereby depose and say as follows:

1.      I am over eighteen years of age.  The information contained in this affidavit is based on my personal knowledge, and it is based on my review of business records that are made at or near the time of the relevant events and that are kept in the course of Callaway Partner, LLC's ("Callaway") regularly conducted business activities, because it is Callaway's regular business practice to keep such records, including payroll registers and time sheets.

2.      I am employed as Director of Recruiting for Huron Consulting Group, Inc.  From approximately December 2003 until May 2007, I was employed as Controller or Vice President of Finance and Administration for Callaway.

3.      Callaway was an accounting professional services firm that specialized in project management and staff augmentation for clients ranging from start-ups to Fortune 1000 companies.

4.      In 2007, Callaway was sold to Huron Consulting Group, Inc. ("Huron").

5.      Starting in September 2003, Callaway was engaged to staff a project for HealthSouth Corporation ("HealthSouth") in Birmingham, Alabama.

6.      HealthSouth had been accused of perpetrating a multi-billion dollar accounting fraud by grossly misstating its finances.

7.      Accountants and consultants from numerous firms, including Callaway, were engaged to assist HealthSouth in restating its financials.

8.      Callaway employed Plaintiff Harriet Bell and the opt-in plaintiffs in this lawsuit (collectively, "Plaintiffs") as consultants to work on the HealthSouth project.

9.      Plaintiffs are highly-educated accountants and Certified Professional Accountants.

10.     HealthSouth paid Callaway for the work based on the billable hours that the consultants worked on the project.

11.     Accordingly, Plaintiffs kept timesheets to record their billable hours so that Callaway could, in turn, bill HealthSouth for the work performed.

12.     Callaway generally classified Plaintiffs as exempt from overtime.[1]

## PLAINTIFFS' COMPENSATION AT CALLAWAY

13.     There were two independent components to Plaintiffs' compensation: (1) a fixed, predetermined weekly salary; and (2) a bonus.

**Weekly Salary**

14.     Plaintiffs were paid a weekly salary in excess of $455.

15.     Plaintiffs' salaries did not depend on the number of hours Plaintiffs worked, or otherwise depend on the quality or quantity of work they performed.

16.     The offer letters sent to Plaintiffs stated that Plaintiffs were paid a weekly salary and provided the amount of that salary.

17.     Plaintiffs' guaranteed weekly salaries ranged from approximately $1,600 to $2,000 per week depending on the consultant.

18.     For example, the offer letter sent to Plaintiff Bell stated, "Your weekly salary will be $1600 per week . . . ."

19.     Copies of the offer letters to Plaintiffs, which Callaway kept in the regular course of business, are attached hereto as Exhibit A.[2]

---

[1] Plaintiff Barbara Sykes was not always classified as exempt; during some of her employment she was classified as non-exempt and paid on an hourly basis.

3

20.     Plaintiffs were also each provided a copy of Callaway's Employee Handbook at or around the inception of their employment.   A copy of the Employee Handbook, which Callaway keeps in the usual course of business, is attached hereto as Exhibit B.

21.     Starting in September 2004, a PowerPoint presentation that Callaway showed to Plaintiffs at the start of their employment on the HealthSouth engagement also clearly stated that Plaintiffs received a fixed, predetermined salary paid each week: "Every employee assigned on the HealthSouth engagement is paid a guaranteed **weekly salary**."  (Emphasis in original.)

22.     A copy of the PowerPoint presentation, which Callaway kept in the usual course of business, is attached hereto at Exhibit C.

23.     The PowerPoint also noted that certain deductions could be made to the weekly salary:

> For each week you are employed by Callaway, working on the HealthSouth engagement, you are entitled to your full weekly salary, subject to a few exceptions, listed below:

---

[2] Callaway cannot locate offer letters for the following Plaintiffs:  Patrick Barry, Jeffrey Campora, Jerry Dunn, Sheila Frank (Hatcher), Fatima McCullough, Pamela Nunez, Rickey Patterson, Pareta Roberts, Diane Serra, and Diane Simpson. However, each of those Plaintiffs would have also received offer letters stating that that they would be paid a regular weekly salary of at least $1,600.00 per week prior to beginning work on the HealthSouth project.

- "Days" not worked for personal reasons, unpaid vacation, or illness (can be offset by PTO days earned)

- Unpaid disciplinary suspensions imposed for infractions of workplace conduct rules

- In initial or terminal weeks of employment:  Salary may be prorated for time actually worked in the first and last week of employment

- Weeks where the project is shut down completely and no work is performed, salary will not be paid (example may be Christmas week or Thanksgiving).

24.    Under the first exception, Plaintiffs could take an unpaid day off from work if they did not have Paid Time Off ("PTO") to use.  This exception only applied if Plaintiffs took a full regularly-scheduled day (Monday through Friday) off from work.

25.    If Plaintiffs performed any work on a given regularly-scheduled day, they were paid their full pro-rata weekly salary (1/5 of their weekly salary) for that day.

26.    Indeed, Plaintiffs commonly left work in the early afternoon on Fridays to drive back to Atlanta from Birmingham but received their full pro-rata salary for that day of work.

27.    For example, timesheet records for Plaintiff Toni Moseley for the week ending November 14, 2004, show that she worked all five regularly-scheduled workdays during the week.  However, Plaintiff Moseley worked only 38

hours during the week and left early on Friday of that week. The payroll record for that same week shows that she was paid her full weekly salary, $1,800.00 for the week despite not working 40 hours and despite leaving work early on Friday.

28.     Callaway never deducted from a consultant's salary if he or she did not perform any work on a non-regularly scheduled day, that is, Saturday or Sunday.

29.     Attached as Exhibit D is a chart describing at least sixty-seven (67) occasions where an employee did not work enough hours during a week to average at least eight (8) hours per regularly-scheduled workday but still received his or her full salary or pro-rata salary for the week.

30.     Under the second exception, Plaintiffs would not be paid for a full day off due to a disciplinary suspension.

31.     Under the third exception, Plaintiffs could be paid on an hourly basis during the first and last weeks of their employment, as expressly permitted under the Fair Labor Standards Act.

32.     Under the fourth and final exception, Plaintiffs would not be paid their weekly salary during weeks in which no work was performed on the project (i.e., the entire project was shut down).

33.    Plaintiffs collectively worked 7,871 weeks on the HealthSouth project.

34.    Plaintiffs were paid their weekly salary or the correct pro-rata amount of their salary for each week they were employed on the project.

**Bonus**

35.    In addition to earning a fixed and predetermined weekly salary, Plaintiffs were also eligible to earn a bonus.

36.    Callaway designed its bonus plan to encourage consultants to work additional time on the HealthSouth project because there was a great deal of work to be performed.

37.    Initially, the bonus system provided additional compensation to Plaintiffs for weeks in which they worked over 40 hours, but it looked at past hours worked in addition to the hours worked in a specific week.    Beginning in approximately early 2005, Callaway changed the plan and began paying a bonus to Plaintiffs when they worked fewer than five regularly-scheduled days but averaged more than eight hours of work per day during the days worked.

38.    Callaway determined the rate of the bonus for each consultant by taking a consultant's salary and dividing it by 40.  For example, if a consultant had

a $1600 predetermined weekly salary, he would be paid a bonus of $40 for each hour worked in excess of 40 in a given workweek.

39.    Callaway's PowerPoint stated:

For each week you are employed by Callaway, receiving a weekly salary while working on the HealthSouth engagement, you will earn a bonus for billable hours worked in excess of 40 hours. . . . Any deficit created in a given week (where billable hours are less than 40), will be carried forward and applied against future week's [sic] bonus calculation.    This calculation has <u>no effect</u> on an employee's guaranteed weekly salary.

40.    The bonus system had no effect whatsoever on the payment of the predetermined weekly salary.

41.    If a Plaintiff worked seven and not eight hours on each regularly-scheduled workday, thus totaling 35 hours of work, he or she still earned the full predetermined weekly salary.

42.    The Plaintiff simply would not earn a bonus until he or she made up the bonus-hour deficit of five hours and then worked over 40 hours in a given week.

43.    The PowerPoint presentation shown to Plaintiffs at the beginning of their employment provided three examples of how the bonus system was applied.

44.    The three examples illustrated were as follows:

**Bonus Example #1**

A project professional works a full week, is paid their full weekly salary, and reports 55 billable hours. This project professional's weekly salary is $1,000 and is in good standing with Callaway. There is no "bonus hour deficit" from the previous week.

| | |
|---|---|
| Billable Hours | 55 |
| Weekly Billable Hour Bonus Threshold | (40) |
| Bonus Hours Earned | 15 |
| Deficit from previous week | (0) |
| Weekly Bonus Hours | 15 |
| x effective hourly rate | $25.00 |
| Weekly Bonus Amount | $375.00 |

**Bonus Example #2**

A project professional works a full week, is paid their full weekly salary, and reports 35 billable hours. This project professional's weekly salary is $1,000 and is in good standing with Callaway. There is no "bonus hour deficit" from the previous week.

| | |
|---|---|
| Billable Hours | 35 |
| Weekly Billable Hour Bonus Threshold | (40) |
| Bonus Hours Earned | (5) |
| Deficit from previous week | (0) |

| Weekly Bonus Hours | (5) To be carried over to next week |
| x effective hourly rate | $25.00 |
| Weekly Bonus Amount | $0 |

## Bonus Example #2a

The next week, the same project professional works a full week, is paid their full weekly salary, and reports 60 billable hours.  This project professional's weekly salary is $1,000 and is in good standing with Callaway.

| Billable Hours | 60 |
| Weekly Billable Hour Bonus Threshold | (40) |
| Bonus Hours Earned | 20 |
| Deficit from previous week | (5) |
| Weekly Bonus Hours | 15 |
| x effective hourly rate | $25.00 |
| Weekly Bonus Amount | $375.00 |

## Bonus Example #3

A project professional takes 2 personal days and works 3 days, is paid 3/5 of their weekly salary, and reports 35 billable hours.  This project professional's normal weekly salary is $1,000, $600 paid for this week after $400 deduction for 2 full day absences for personal reasons.  He/she is in good standing with Callaway.
There is no "bonus hour deficit" from the previous week.

10

| Billable Hours | 35 |
|---|---|
| Weekly Billable Hour Bonus Threshold | (24) Prorated (3/5 x 40 = 24) |
| Bonus Hours Earned | 11 |
| Deficit from previous week | (0) |
| Weekly Bonus Hours | 11 |
| x effective hourly rate | $25.00 |
| Weekly Bonus Amount | $275.00 |

45.    The bonus system took into consideration past work performance as well as current performance to reward those who performed overall and not just in any one week, and to prevent abuse of the bonus system.

46.    If there was no "deficit" that could be applied to bonus hours, then a Plaintiff could have worked one hour per day Monday through Friday and received, as he or she must, his or her full weekly salary.

47.    Then in the next week the Plaintiff could have billed 50 hours, thus entitling him to a significant bonus even though his performance over the two-week period was poor.

48.    Instead of such a system that only provided bonuses based on work in each individual week, Callaway chose a bonus system that looked more broadly at its employees' cumulative performance.

**PLAINTIFFS' ALLEGATIONS REGARDING THEIR BONUSES**

49.    In their discovery responses, Plaintiffs have identified approximately 53 weeks in which a bonus-hour deficit was incurred and later applied out of 7,871 weeks worked.

50.    Callaway analyzed each of those 53 instances that Plaintiffs identified using our payroll and timesheet records.

51.    A table analyzing those 53 weeks is attached hereto as Exhibit E.

52.    The payroll and timesheet records used to create Exhibit, which Callaway has kept in the usual course of business, are attached hereto as Exhibit F.

53.    At no time was a bonus-hour deficit applied to reduce Plaintiffs' predetermined, weekly salary.

**PLAINTIFFS' ALLEGATIONS REGARDING THEIR WEEKLY SALARIES**

54.    In their discovery response, Plaintiffs have identified approximately 30 weeks out of the 7,871 weeks of payroll and timesheet data provided to them in which they claim that a consultant did not receive his or her regular weekly salary.

55.    Callaway analyzed each of the 30 instances that Plaintiffs identified using our payroll and timesheet records, which I have kept in the usual course of business.

56.     Two (2) of the weeks originally identified by Plaintiffs concerned individuals, Mark Herak and Kay Welborn, who have been dismissed from this action and are no longer part of the case.

57.     Three (3) of the remaining 28 weeks identified by Plaintiffs concerned payments made to Plaintiff Barbara Sykes during a time period when Plaintiff Sykes was employed on an hourly, not salary, basis.  *See* Offer Letter dated November 22, 2006, contained in Exhibit A.

58.     Twelve (12) of the remaining 25 weeks identified by Plaintiffs concerned payments that were properly calculated under a pro-rata basis as allowed when the employee missed regularly-scheduled workdays for personal reasons.

59.     A table analyzing the twelve (12) weeks referenced in the previous paragraph is attached hereto as Exhibit G.

60.     As to the remaining thirteen (13) weeks identified by Plaintiffs, when reviewing payroll records and timesheets during the course of this litigation, Callaway first learned that it inadvertently may have failed to pay certain Plaintiffs their full salary or pro-rata salary on those few occasions.  Callaway determined that any attempt to conduct an investigation to reconstruct the specific circumstances of each of these few instances from past years would entail far

greater expense than the small amounts in question. It was more cost efficient for Callaway simply to pay the difference between the amount paid during the weeks in question and the pro-rata salary amount for the regularly-scheduled days apparently worked. Callaway thus provided the following Plaintiffs with checks in the following amounts: Angela Beavers ($140); Pamela Nunez ($160); Michael Kalmerton ($1,878.75); Lillian Odette Yeager ($40); Toleda White ($270); Louis Smeraglia ($11.25); Michael Moss ($50); Julie McMillan ($180); and Gideon Sipin ($25). These payments did not cover any of the weeks in question for which Plaintiffs had signed WH-58 releases. Copies of the signed releases for Michael Kalmerton and Elaine Shelton, which Callaway kept in the regular course of business, are attached hereto as Exhibit H.

61.     Attached as Exhibit I is a chart noting how the amounts of payment in the previous paragraph were determined and copies of the checks sent out to the Plaintiffs for those payments, which Callaway kept in the regular course of business.

62.     The payroll and timesheet records used to create Exhibits D, G, and H, which Callaway kept in the regular course of business, are attached hereto as Exhibit J.

According to 28 U.S.C. §1746, I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this _15_ day of May, 2009.

By: _Deborah L. Erickson_
Deborah Erickson